Filed 5/23/23  In re I.B. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re I.B. et al., Persons Coming Under the Juvenile Court Law. | B322210 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> J.B., <br><br> Defendant and Appellant. | Los Angeles County Super. Ct. No. 22CCJP00187AB |

APPEAL from an order of the Superior Court of Los Angeles County, Craig S. Barnes, Judge. Affirmed.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

In this juvenile dependency case, father challenges the court's jurisdictional finding under Welfare and Institutions Code section 300, subdivision (b) regarding two of his children, two-year-old I.B. and newborn J.R. (the minors).[1] The court found that the minors would be at substantial risk of serious physical harm in father's custody because father abused another newborn child in 2004, causing multiple, severe injuries. That abuse led to a conviction for child abuse and a seven-year prison term.

Although the prior instance of abuse is remote in time, we reject father's contention that there is no nexus between that conduct and a risk of harm to the minors. Specifically, the severity of the injuries in the prior case and the additional evidence of a pattern of abuse of that newborn child, coupled with the age of the minors in this case and the absence of any rehabilitative efforts on father's part, provide substantial evidence to support the court's jurisdictional findings. Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. Background

Father is the presumed father of I.B. (born 2020) and J.R. (born 2022.) At the outset of these proceedings, mother lived with I.B. in an apartment. Father did not live with mother but stayed with her frequently at her apartment and spent time with the minors.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

## 2. Referral Regarding Mother

The Department of Children and Family Services (Department) received a referral regarding the minors in mid-January 2022, after both mother and J.R. tested positive for amphetamine at J.R.'s birth. The Department filed a petition under section 300, subdivisions (b) and (j), alleging that mother's drug abuse rendered her unable to provide care for her young children and that her use of amphetamine while pregnant with J.R. placed the minors at risk of serious physical harm. The court ordered the minors detained from mother and father on January 19, 2022, and ordered the Department to evaluate father for possible placement.

## 3. Investigation Regarding Father

The Department's investigation revealed that father had a criminal record, including a 2005 conviction for child cruelty (Pen. Code, § 273a, subd. (a)) for which father served a seven-year prison sentence. After his release, father was convicted on a charge of assault with a deadly weapon (Pen. Code, § 245, subd. (a)) and sentenced to four years in state prison. Father also had an extensive record as a juvenile, including charges for burglary, murder, attempted murder, assault with a firearm, assault with a semi-automatic firearm, and vehicle theft.

During an interview with a Department social worker, father stated that if the minors would not be released to mother he would like to care for them himself. Mother expressed the same desire. He indicated a willingness to change his work schedule to meet the needs of the minors. Father was resistant to many of the social worker's questions, however, and declined to disclose matters he deemed to be "unrelated to case issues" or

"confidential information." Father also said that he helped mother pay for her apartment and provided financial assistance for I.B. and his other children.[2]

The Department and minors' counsel recommended against placing the minors with father. At the hearing, father's counsel responded that father's convictions for violent acts took place long ago and that father served his time and was rehabilitated. Minors' counsel noted, however, that father had not explained what sort of rehabilitative activities related to his violent conduct, even though he had the opportunity to do so. The Department also noted that father believed the minors had been wrongfully detained from mother, notwithstanding her 17-year history of drug abuse and use of amphetamine while pregnant with J.R. This attitude, the Department maintained, showed a lack of insight and possible inability to protect the minors. Ultimately, the court did not place the minors with father but gave the Department discretion on the issue.

In March 2022, the Department submitted a report regarding jurisdiction and disposition. The Department's investigation revealed additional details about father's criminal conviction for child abuse. Specifically, in September 2005, the juvenile court sustained five jurisdictional allegations regarding father's infant daughter, Emily. Generally, the allegations stated that Emily—who was then two months old—had been medically examined in November 2004 and was found to have "two skull fractures, an acute and sub[-]acute subdural hematoma at different ages of bleed, four rib fractures at different stages of healing, a fractured tibia, two foot fractures, [and] a bruise to the

--------

[2] The Department's report indicates that father has "8–10" children.

right ear." She was also suffering from seizures. The injuries were consistent with "inflicted trauma" and "would ordinarily not be sustained except as the result of the unreasonable or negligent acts or omissions of the child's mother and father, who had the care, custody and control of the child." Emily's mother's and father's explanations as to how the injuries occurred were inconsistent with the child's injuries. Apparently, father later explained that he "threw the child on the bed," she "bounced on the bed and hit the headboard and the wall," and then "landed between the wall and the bed." The court did not order family reunification services for father, who was then incarcerated. The court awarded mother full legal and physical custody of Emily and her two brothers.

The Department also discovered two juvenile dependency referrals regarding domestic violence between father and his ex-wife. The first incident, in late 2018, was deemed inconclusive. Father and his ex-wife agreed that they had had a heated argument. She alleged that the argument escalated and that father broke her phone, threw a coffee jar at the television and caused it to break, and pushed her so hard that it caused bruising on her shoulder. Father admitted that he broke the television but denied that the argument became physical. One of their children was in the room during the incident and the other was sleeping nearby.

The ex-wife reported a second incident which occurred in mid-May 2019. At that point, father had moved out of the family home and the couple's divorce was in process. According to the ex-wife, father came to visit the children. During the visit, he attacked her, slapping her on her face and choking her in front of

the children. She sustained bruises to her left eye and cheek area.

During the current proceedings, father's ex-wife spoke to a Department social worker and confirmed father was abusive to her and hit her in front of the children. Their divorce was finalized in May 2019.

## 4.     Amended Petition

In early March 2022, the Department filed an amended petition including the following allegation as to father: "On 09/26/2005, at Disposition hearing, the Court declared the [minors'] sibling, [Emily], as a dependent of the Juvenile Court under WIC 300 subdivisions- a, b, e and i. On 09/26/2005, the Court did not order Family Reunification Services for [father] with [Emily]. On or about 11/08/2004, [Emily] was medically examined and found to be suffering from a detrimental condition including but not limited to, two skull fractures, an acute and sub[-]acute subdural hematoma at different ages of bleed, four rib fractures at different stages of healing, a fractured tibia, two foot fractures, [and] a bruise to the right ear. As a result, [Emily] suffered from seizures. This child's injuries were consistent with inflicted trauma. On 02/23/2005, as a result of the father's confession to causing the non-accidental injuries to [Emily], he was convicted of penal code, 273A(A) and sentenced to 7 years in prison. On 01/08/2007, jurisdiction was terminated for [Emily] and the child's mother was awarded full legal and physical custody of the child. The father was ordered to have monitored visits with the child. As such, the father's failure to protect and his conduct which caused physical harm to [Emily] places [the minors], who are of such a young age as to require constant care and supervision, places [*sic*] their physical and emotional health

6

and safety at risk of harm, damage, danger and death." The Department requested that the court bypass father for reunification services.

In a last minute information dated April 7, 2022, the Department reported that father had not participated in any recommended services. He said, however, that he would enroll and participate in services once they were ordered by the court.

### 5. Adjudication; Disposition; Appeal

The court adjudicated the amended petition on April 12, 2022 and found true the jurisdictional allegation regarding father. In a last minute information dated June 9, 2022, the Department reiterated that father was still not participating in any recommended services.

A contested disposition hearing took place on June 10, 2022. The court recognized that father had stayed engaged with the Department and had sought to establish his parentage. In addition, father and mother had regularly visited the minors and were appropriate with them. And the court indicated that the Department sought to bypass reunification services for father under an inapplicable code section. Father's counsel did not argue against removal, instead suggesting that a period of supervision with family reunification services was appropriate: "Providing the parents with services over the next few months and having the Department have – keep its eyes on the family is exactly what needs to happen at this point. But it allows at least the family to do programs so that they're able to reunify with their children, which is what the dependency court – was the point here." The court ordered the minors removed from mother and father. Father's case plan includes participation in a 12-step program for a minimum of 12 months, six random, on-

demand drug tests, conjoint counseling with mother, and individual counseling to address addiction, parenting, and mental health.

Father timely appeals.

## DISCUSSION

### 1.   Justiciability

As an initial matter, we note that the Department contends father's appeal is not justiciable because the jurisdictional findings regarding mother are unchallenged and therefore the minors will remain under the protection of the Department regardless of the outcome of father's appeal. Because father would be non-offending and potentially be eligible to take custody of the children but for the challenged jurisdictional findings, we exercise our discretion to consider his appeal on the merits. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762–763, disapproved on an unrelated point by *In re D.P.* (2023) 14 Cal.5th 266, 283 [noting Court of Appeal may hear a jurisdictional challenge brought by one parent if "(1) [the jurisdictional finding] serves as the basis for the dispositional orders that are also challenged in the appeal [citation]; (2) [the findings] could be prejudicial to the appellant or could impact the current or any future dependency proceedings [citations]; or (3) [the finding] 'could have other consequences for [the appellant], beyond jurisdiction' "].)

We now turn to father's challenges to the court's jurisdictional finding.

### 2.   Substantial evidence supports the jurisdictional finding.

Father contends the jurisdictional finding relating to him is not supported by substantial evidence. We disagree.

8

### 2.1. Standard of Review

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. ... "[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence ... such that a reasonable trier of fact could find [that the order is appropriate]." ' " ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) Substantial evidence is " 'evidence which is reasonable, credible, and of solid value[.]' " (*In re I.C.* (2018) 4 Cal.5th 869, 892.)

### 2.2. Legal Principles

Under section 300, subdivision (b), a juvenile court may exercise dependency jurisdiction if the " 'child has suffered, *or there is a substantial risk that the child will suffer*, serious physical harm or illness, as a result of the failure or inability of his or her parent ... to adequately supervise or protect the child ... .' " (See *In re E.E.* (2020) 49 Cal.App.5th 195, 205.) The legislatively declared purpose of these provisions "is to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being

9

neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) "The court may consider past events in deciding whether a child presently needs the court's protection. [Citation.] A parent's ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' [Citation.]" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215–1216.)

### 2.3. Analysis

As father notes, there is no evidence that he has ever abused either of the minors. Accordingly, the Department was required to establish, by a preponderance of the evidence, that the minors are currently at substantial risk of serious harm in his custody. Father contends that the Department failed to meet its burden because the physical abuse of his daughter Emily, which forms the basis of the sustained jurisdictional allegation, was a single incident that occurred long ago. Further, father asserts that he has had several additional children since 2004 and there have been no additional allegations of child abuse.

Substantial evidence supports the court's conclusion that father's violent and abusive conduct was likely to persist. (See *In re Cole L.* (2021) 70 Cal.App.5th 591, 607 [noting jurisdiction based on parent's past conduct must be based upon evidence "the earlier threatening conduct will recur"]; *In re C.V.* (2017) 15 Cal.App.5th 566, 572 ["[j]urisdiction 'may not be based on a single episode of endangering conduct in the absence of evidence that such conduct is likely to reoccur' "]; see also *Georgeanne G. v.*

*Superior Court* (2020) 53 Cal.App.5th 856, 869 [noting that "a finding of risk of harm to a child must be based on more than conjecture or a theoretical concern"].) Several factors support the court's conclusion.

First, father's assertion that the 2004 abuse was a single incident is not supported by the record. The medical evidence indicated that Emily had two subdural hematomas at different bleed ages and multiple rib fractures at different healing stages. The attending neurologist indicated that Emily's skull fractures were likely very recent, but her other injuries were approximately three to four weeks old. Thus, the evidence supports a reasonable inference that Emily was abused on at least two, if not multiple, occasions.

Second, although the 2004 abuse is remote in time, that abuse was severe. At only two months of age, Emily had two skull fractures, an acute and sub-acute subdural hematoma, four rib fractures, a fractured tibia, two foot fractures, and a bruise to the right ear. She was suffering from seizures due to her injuries. And some of her injuries were three to four weeks old—meaning they had been inflicted when she was only a few weeks old. Our Supreme Court has explained, in discussing section 300, subdivision (j), that " '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' … In other words, the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to

11

protect the child from even a relatively low probability of that abuse." (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.) Here, the record permits a reasonable inference that in view of the minors' ages— newborn and two years old at the time of the adjudication—even a single episode of abuse similar to Emily's could have life-threatening consequences for the minors. Thus, even a small likelihood of abuse at father's hands poses a substantial risk of serious harm to the minors.

Third, father has committed violent acts more recently than 2004. In 2012, father was convicted of assault with a deadly weapon. And there is evidence that father assaulted his ex-wife on at least two occasions in front of their children. These events occurred much more recently, in 2018 and 2019.

Fourth, there is no evidence that father has made any effort to address the circumstances that led to Emily's abuse. This is particularly significant due to the age of the minors here. Father explained that he "forcefully threw" Emily after he "became frustrated at the child's constant crying." He admitted that he lost control and although he was remorseful, he also delayed seeking medical care for Emily for several days. But although father notes that he served his time and claims to be "rehabilitated," he has given no indication that he has participated in any sort of course or therapy addressing his loss of control and subsequent abuse of an infant. Father points out that no court ordered him to engage in any such services, but that does nothing to mitigate the potential harm to these minors. Moreover, given that J.R. is the same age Emily was when father abused her, the absence of any rehabilitation specific to his prior loss of control is concerning, at the very least. Yet, father believes that he poses no risk to the minors: "I have rehabbed. I have been

a father. I am a fucking fantastic father. I do what I have to do for my children. All my [exes] can tell you that. Everyone knows my kids come first. I don't believe I need services. I don't believe I need anything." His decision not to participate in voluntary services during the pendency of this case is consistent with his stated view and also is cause for concern. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 [noting "[o]ne cannot correct a problem one fails to acknowledge"].)

Father urges that he has fathered several other children in recent years and has not been accused of child abuse, a circumstance he contends demonstrates that there is no nexus between his past abuse of Emily and a risk of harm to the minors. Assuming father's representation is true, it lacks sufficient detail to be persuasive. For example, father states that I.B. was 21 months old at the time of her detention from mother, he had been "involved" with her since she was born, and there were no allegations he had ever abused I.B. What is lacking, however, is substantial detail about his "involvement" with I.B. The record reflects that I.B. lived with mother full-time, father did not reside with them, and father traveled a great deal for work. The record does not suggest that father regularly cared for I.B. on his own and does not include any detail about the way he spent time with her. Without any context regarding father's relationship with I.B. (or his other children, for that matter), the absence of allegations of child abuse against him is hardly affirmative evidence of parental fitness.

Citing *In re Isabella F.* (2014) 226 Cal.App.4th 128, father argues that a single incident of physical abuse cannot support a finding here that the minors are at substantial risk of abuse from him in the future. As noted, the record supports an inference that

the 2004 incident was not the only instance of child abuse. In any event, father's description of that case is incorrect. There, a minor accused her mother of hitting her and she had scratches on one side of her face and a gouge mark on one earlobe. (*Id*. at pp. 131–132.) The minor denied that other violent incidents had occurred. (*Id*. at p. 133.) The Court of Appeal concluded that evidence was insufficient to establish, under section 300, subdivision (a), that the minor *had suffered serious physical harm* inflicted non-accidentally by mother. But that is not the issue presented in this case. As we have said, there is no evidence father abused these minors in the past and the Department did not assert jurisdiction under section 300, subdivision (a). Instead, the Department sought jurisdiction under section 300, subdivision (b), predicated on the *risk* of serious physical harm in the future given father's history of violence.

Father also contends that his criminal history of violent acts does not support the court's jurisdictional finding. But as we have said, multiple factors support the court's finding in this case and father's prior convictions and reported domestic violence are only a part of the whole picture.

In sum, father seeks custody of a newborn and a toddler and it is therefore likely that, if he prevails, he would experience some bouts of the sort of crying that triggered his prior, uncontrolled, and severe abuse of Emily. Given the absence of insight on his part and the further absence of any rehabilitative effort on his part—including during these proceedings—we

conclude that the court did not err in sustaining the jurisdictional allegation at issue.[3]

## DISPOSITION

The adjudication order is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.

_____

[3] Because we affirm the court's jurisdictional finding, we need not address father's argument that, as a non-offending parent, he should be considered for placement on remand.